UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x
ANDREW CARROLL,

                         Plaintiff,

      -against-

THOMAS C. KRUMPTER, Acting Police
Commissioner, Nassau County, New York,
STEVEN E. SKRYNECKI, Chief of Department,
Nassau County Police Department, DANIEL P.
FLANAGAN, Commanding Officer, First Precinct,
Nassau County Police Department, Officer
BUDINILIC, Badge No. 3051, First Precinct,
Nassau County Police Department; JOHN DOE,
Sargent First Precinct, Nassau Police Department;
NASSAU COUNTY POLICE DEPARTMENT, and
COUNTY OF NASSAU,

                        Defendants.
--------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
15-cv-1550(ADS)(ARL)

**APPEARANCES:**

**The Law Office of Robert T. Bean**
*Attorney for the Plaintiff*
3033 Brighton 3rd Street
Brooklyn, New York 11235

**Carnell T. Fosky, Nassau County Attorney**
*Attorney for the Defendants Thomas C. Krumpter, Steven E. Skrynecki, Daniel P.
Flanagan, Officer Budinilic, Sergeant John Doe, Nassau County Police Department,
and the County of Nassau*
One West Street
Mineola, New York 11501
        By:    Diane C. Petillo, Deputy County Attorney

**SPATT, District Judge:**

This case is one in a series of related actions brought before this Court to challenge the constitutionality of the Nassau County Police Department's policy of confiscating firearms in the course of responding to domestic incidents.

Presently before the Court is a motion by the Plaintiff Andrew Carroll (the "Plaintiff" or "Carroll"), seeking a preliminary injunction preventing the Nassau County Police Department, during the pendency of this action, from retaining possession of or destroying firearms that it confiscated from his home; from illegally searching for, confiscating, or destroying the firearms of similarly situated individuals; and from continuing its firearm confiscation policy in the future.

For the reasons that follow, the motion is granted in part, and denied in part.

## I. Background

On March 25, 2015, the Plaintiff commenced this action against the Defendants Nassau County (the "County"), the Nassau County Police Department (the "Department" or "NCPD"), Acting NCPD Commissioner Thomas Krumpter ("Krumpter"), NCPD Chief Steven E. Skrynecki ("Skrynecki"), NCPD First Precinct Commanding Officer Daniel P. Flanagan ("Flanagan"), NCPD Officer Budinilic, whose first name is unknown to the Plaintiff but is believed to carry badge number 3051 ("Budinilic"), and a John Doe Defendant, whose identity is unknown to the Plaintiff but who is believed to be a Sergeant in NCPD's First Precinct.

Carroll asserted claims under 42 U.S.C. §§ 1983, 1985 and 1988, arising from alleged deprivations of his Second, Fourth, Fifth, and Fourteenth Amendment

rights. He also alleges common law claims based on conversion and intentional infliction of emotional distress.

This case was originally assigned to United States District Judge Joanna Seybert. However, it being one in a series of related cases before this Court, on April 22, 2015, it was reassigned to this Court.

On May 15, 2015, the Plaintiff filed the instant motion, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65, seeking the preliminary injunctive relief outlined above.

A.    The Relevant Factual Background

The following facts are drawn from the complaint and any supporting evidence submitted with the instant motion.

1.    The Facts Relating to the Department's Firearm Confiscation Policy

Fundamentally, this case involves the NCPD's application of Department Procedure OPS 10023, Removal and Disposition of Weapons—Domestic Incidents/Threats to Public Safety (the "Confiscation Policy"), which both parties agree is the relevant police policy authorizing the confiscation of firearms during domestic incidents. Thus, before turning to the specific facts of this case, the Court finds it appropriate to begin with an overview of the official source of the challenged police activities.

In furtherance of its mission "to afford the public the greatest protection available against threats of violence," the NCPD's policy is to "remove, when warranted" all "firearms, rifles, and shotguns . . . from persons involved in domestic

incidents or when such weapons pose a threat to the public safety." To that end, the Policy establishes a step-by-step framework for removing firearms, rifles, and shotguns, which applies when police officers respond to domestic incidents. In particular, under the Policy, a responding officer performs the following acts:

1. *Confiscates* illegally possessed firearms, rifles, and shotguns *and*
   a. if present, *arrests* the offender, . . .
   b. *processes* the evidence.

2. *Confiscates* pistol licenses and licensed firearms when the licensee is:
   a. arrested,
   b. the subject of an order of protection,
   c. involved in physical violence or the threat of violence.

                              *     *     *

3. *Confiscates* legally possessed firearms, rifles and shotguns when such firearms, rifles and shotguns create a threat of violence or threat to the public safety.

4. *Accepts* legally possessed firearms, rifles, and shotguns that are voluntarily surrendered by persons.

5. *Renders* firearms, rifles, and shotguns safe.

6. *Prepares* PDCN Form 41, Property Receipt, *and*
   a. gives a copy to the owner,
   b. *forwards* a copy to the Precinct Domestic Incident Liaison Officer,

7. *Invoices* the confiscated property.

(emphasis in original).

Further, the Policy provides a framework to govern "returning, retaining or destroying the firearms, rifles, and shotguns after completion of an investigative

4

review." In particular, under the Policy, it is the duty of the designated Precinct Domestic Incident Liaison Officer to do the following:

1. *Reviews* all incidents involving confiscation of rifles and shotguns as soon as possible,

2. *Determines* if the confiscation of rifles and shotguns was appropriate.

3. *Ensures* the immediate return of confiscated rifles and shotguns in the following situations:
   a. confiscation was inappropriate,
   b. new information is learned which makes the confiscation inappropriate.

4. *Initiates* an administrative review to determine if a legal impediment exists *not* to return confiscated rifles and shotguns,

5. *Mails* the following forms, return receipt requested, to the owner of the rifles and shotguns:
   a. PDCN Form 173, Long Gun Review Record, *and*
   b. Long Gun Cover Letter.

6. *Forwards* [certain] *mandatory* information to the Desk Personnel and *directs* them to request a National Crime Information Computer (NCIC) inquiry, using the QICS format, to determine if there is any information that would prohibit a return of firearms, rifles, and shotguns under the Federal Gun Control Act [18 U.S.C. § 922] . . .

\*     \*     \*

12. *Determines* if any of the following conditions exist:
    a. the owner is prohibited from possessing rifles or shotguns under the Federal Gun Control Act,
    b. the owner has a relevant pending court disposition,
    c. the owner is a subject of an order of protection,
    d. the owner has a relevant Nassau County arrest history,
    e. domestic incidents have occurred since the time of the confiscation or voluntary surrender,
    f. other extenuating circumstances which indicate that rifles and shotguns should not be returned.

13. *Interviews* the investigating detective, if the Detective Division was involved in the initial incident.

14. *Interviews* the victim of a domestic incident, outside the presence of the offender, to determine the following:
   a. current status of the relationship,
   b. if there have been any threats since the initial incident,
   c. whether the victim believes that the rifles and shotguns can be safely returned,
   d. any other circumstances relevant to the return of the rifles and shotguns.

15. *Reviews* the gathered information to determine if the rifles and shotguns should continue to be held or be returned.

16. If notified by a Pistol License Section Supervisor that the owners [*sic*] license has been reinstated:
   a. *prepares* a brief narrative report outlining the investigation, *indicating* that Pistol License Section has concluded a pistol license investigation and is reinstating the owners [*sic*] license, *and*
   b. *forwards* the following to the Patrol Division Domestic Incident Coordinator:
      (1) narrative report,
      (2) copy of internal correspondence received from Pistol License Section regarding the reinstatement of pistol license. . . .

17. *Prepares* a brief narrative report outlining the investigation, including a recommendation as to whether the rifles and shotguns should be returned.

18. *Prepares* the following forms, if the rifles and shotguns will be returned:
   a. PDCN Form 83, and
   b. PDCN Form 110, Property Bureau Notice to Claimant Card.

19 *Forwards* the following to the Patrol Division Domestic Incident Coordinator:
   a. narrative report,
   b. PDCN Form 83, if prepared,
   c. PDCN Form 100, if prepared.

\*       \*       \*

23. If the shotguns and rifles *will not* be returned, *notifies* Legal
    Bureau to initiate legal proceedings.

24. *Notifies* the following regarding the status of the rifles and
    shotguns:
    a. victim, if one exists,
    b. owner, only if rifles and shotguns will be returned.

25. *Notifies* PB to destroy firearms, rifles and shotguns in the following
    situations:
    a. owner can not [*sic*] be located,
    b. owner does not want rifles and shotguns returned,
    c. an investigation reveals a legal impediment still exists not to
       return the rifles and shotguns.

(emphasis in original).

With this framework in mind, the Court now turns to the relevant facts in

this case.

**2.    The Facts Relating to the Plaintiff Carroll**

Carroll states in a supporting affidavit that he resides in Bellmore, New

York, in a home owned by his grandmother. He occupies an attic apartment, and

his mother occupies a separate basement apartment in the same house.

According to Carroll, his mother claimed that he owed her $50. On

September 30, 2014, while Carroll was at work, his mother removed from his

apartment an AR-15 rifle, which belonged to him. Apparently, Carroll's mother

took the weapon "as collateral for the [$50] loan" and claimed to have "sold it or

given it away to another person." Carroll called the NCPD.

When officers, including the individual Defendant Officer Budinilic, arrived,

they discovered the missing AR-15 rifle in Carroll's mother's basement apartment

and confiscated it. They also confiscated a 22-calber rifle and a shotgun, both belonging to Carroll.

According to Carroll, the officers advised him that his firearms would be returned to him before the end of the night if no criminal charges had been filed by that time. However, later in the evening, an unidentified NCPD Sergeant, namely the John Doe Defendant in this action, arrived at Carroll's home and informed him that the Department had made the decision to "keep the guns." In this regard, Carroll asserts that he was given a receipt for his firearms and a police report, and was told that he would thereafter be provided with the necessary paperwork to facilitate the return of his property.

A copy of the receipt that was provided to the Plaintiff is in the record and indicates that the NCPD confiscated the following items of personal property: (i) a Mossberg twelve-gauge shotgun; (ii) a 22-caliber long arm rifle manufactured by the Henry Repeating Arms Company; (iii) a DS-15 rifle manufactured by Dark Storm Industries; and (iv) a 5.56 millimeter ammunition magazine. The receipt further states as follows:

> The return of rifles and shotguns will be based on the results of an administrative review. To facilitate this review, this Department will be forwarding to the above address a Long Gun Review Record form.
>
> Please complete and return the form, as instructed, to expedite this process.
>
> Legal disposition of all licensed firearms, rifles, shotguns and other weapons must be made within one year from the date of this receipt, or same will be destroyed in accordance with law. (Section 400.05 P.L.)

Carroll claims that three weeks passed without any such paperwork being provided to him, despite the fact that no criminal charges were filed against him; no order of protection was issued; and he is not otherwise disqualified from owning or possessing a firearm. In fact, Carroll states that he purchased another AR-15 rifle to "replace" the one that was confiscated.

Eventually, on November 8, 2014, approximately five weeks after the confiscation, Carroll went to the NCPD's First Precinct to "get [his] shotgun and rifle back." Apparently, at that time, he was directed to speak with NCPD Deputy Inspector Gisondi, who, for purposes of the Confiscation Policy, is the First Precinct's Domestic Incident Liaison Officer. However, Inspector Gisondi was unavailable on that date. Although he claims to have left his contact information with someone at the precinct and requested that Gisondi contact him, Carroll claims not to have received any responsive communication from Gisondi or any other member of the Department for several more months.

On March 25, 2015, his firearms still in police custody, Carroll commenced this action.

### 3. The Factual Allegations Relating to Non-Parties

The Plaintiff's motion papers attempt to seek relief not only on behalf of Carroll, but also on behalf of "other similarly situated persons." In this regard, the Plaintiff's motion papers recite facts concerning individuals by the names of William Livore and Marc W. Weinstein, and include affidavits by these men.

In this regard, the Court notes that the complaint identifies only Carroll as a Plaintiff. It does not include any allegations relating to other individuals. On the contrary, Weinstein has commenced a separate action in this Court, in his own name, which seeks relief that is identical to the relief sought by Carroll in this case. Further, the Court notes that there has been no motion for class certification and no other indication that this case is intended to proceed as a class or collective action. In fact, no one other than Carroll, including the two individuals described below, has appeared in this case or sought to intervene.

Without expressing an opinion at this time as to whether the Plaintiff may properly pursue claims for relief on behalf of these non-parties, the Court notes the following facts, which are drawn from their supporting affidavits.

### a. Non-Party William Livore

Livore resides in Syosset, New York, with his wife, adult son, and adult daughter. On or about December 14, 2010, his wife and daughter got into an argument that resulted in his daughter shattering his wife's car windshield. Livore was not present at the time of this incident.

Four days later, on December 18, 2010, Livore's wife and daughter again got into an argument. Livore claims to have "got[ten] things calmed down," but his daughter called the police and officers eventually arrived. Livore does not so indicate, but, taking judicial notice of the fact that Syosset is located within the County of Nassau, the Court assumes that the police officers referred to in his affidavit were members of the NCPD.

According to Livore, the responding officers asked whether firearms were in the residence. Livore answered in the affirmative, and advised the officers that the guns were secured in a gun safe, to which he alone had access. Nevertheless, the police confiscated his pistol permit and firearms. Livore testified that approximately one year later, his permit and his firearms were returned to him.

However, Livore claims that the year-long separation from his firearms had a monetary effect on him. He stated that he owns a "wrecker service," which requires him to occasionally travel into locations that he does not believe are safe. Accordingly, he stated that he carries a handgun for self-protection. When the NCPD confiscated his license and firearms, he claims to have declined an unspecified number of jobs, apparently because he would not have felt safe performing those jobs without a gun. Therefore, he allegedly suffered an attendant, although unspecified, loss of income.

The Court further notes that Livore makes statements regarding a bladder surgery that he underwent about the time of the confiscation of his weapons. The Court finds, based on the evidence presented to date, that these statements are not relevant to the instant motion and will not consider them at this time.

### b.  Non-Party Marc W. Weinstein

The facts relating to Marc Weinstein are stated in detail in this Court's August 17, 2015 Memorandum of Decision and Order. See Weinstein v. Krumpter, 14-cv-7210, 2015 U.S. Dist. LEXIS 108169 (E.D.N.Y. Aug. 17, 2015) (Spatt, J.). Nevertheless, Weinstein submitted a supporting affidavit in this case which states

as follows: on February 25, 2014, while at his home in Baldwin, he got into an argument with his adult son, Abraham, over the use of their washing machine. The two shouted at one another, prompting Winstein's wife to call the police.

NCPD officers responded to the call and, upon arriving at the residence, discovered that the incident between Weinstein and his son had been peaceably resolved. However, the officers allegedly requested to view the Plaintiff's pistol license. Weinstein complied. Although the amount or type of firearms he possessed at that time is not specified, Weinstein states that the officers requested that he voluntarily surrender them. Allegedly, these firearms had been secured by Weinstein in gun safes at all relevant times.

Weinstein claims to have refused the officers' request, at least in part, because he "had a shooting match that weekend and needed some of the guns for that purpose." The officers allegedly left the premises without making any arrests.

Approximately three hours later, five officers, who Weinstein asserts were armed, arrived at his home and demanded that he surrender his pistol license, firearms, and long arms. He states that no search warrant or written order to surrender his firearms was provided. However, allegedly, the officers threatened to arrest Weinstein for "menacing" and other unspecified criminal charges if he refused to comply.

Weinstein opened his gun safe and surrendered an unspecified number and type of firearms that he alleges were legally owned. He claims to have done so under duress and without giving his consent.

Weinstein further alleges that, in the weeks following the incident, he and his family cooperated with the NCPD by producing information and documents requested by the Department. His wife and son provided sworn written statements that, on the night in question, there had been no violence; no threats of violence; and no brandishing of weapons.

Apparently, over the course of nine months after the confiscation, Weinstein requested, both orally and in writing, that his firearms be returned to him, to no avail. On an unspecified date, Weinstein was allegedly informed that the Department's investigation into the incident was complete, but that approval from a superior within the NCPD was required before the Plaintiff's firearms could be returned. This approval had allegedly been delayed for unspecified reasons.

Though not set forth in the February 18, 2015 affidavit submitted in support of the instant motion, the Court will take judicial notice of the fact, established in Weinstein's related action in this Court, that as of April 11, 2015, the Department had returned his pistol license and all of the firearms it confiscated on the date in question.

## B.    Procedural History

Based on these events, on March 25, 2015, Carroll commenced this action, alleging violations of his Second, Fourth, Fifth, and Fourteenth Amendment rights, as well as asserting various common law claims, including conversion and intentional infliction of emotional distress.

On May 14, 2015, Inspector Gisondi wrote a letter to the Plaintiff's counsel,

Robert T. Bean, which stated as follows:

> Be advised that this Department is in possession of long gun(s) belonging to your client, Andrew Carroll.
>
> Please have your client complete the enclosed Long Gun Review Record form and return it to the address indicated below.
>
> Your response will be reviewed and considered in deciding the eventual disposition of any long gun(s).

Attorney Bean asserts that he immediately forwarded this document to

Carroll to complete. However, the next day, on May 15, 2015, Carroll also filed the

instant motion, pursuant to Fed. R. Civ. P. 65(a), seeking the following injunctive

relief:

> [E]njoining all defendants and their agents, officers, contractors and/or employees:
> 1. From destroying firearms seized by the defendants from the plaintiff;
> 2. From retaining possession of said firearms;
> 3. From searching for firearms in the home of plaintiff and other similarly situated persons, without cause, where there is no Order of Protection, no domestic violence, and no arrest or charges filed;
> 4. From seizing firearms from the plaintiff and other similarly situated persons without cause, where there is no Order of Protection, no domestic violence, and no arrest or charges filed; [and]
> 5. From continuing its policy of confiscating firearms in the even [*sic*] of any "domestic incident" with a "police presence" even though there is no crime, no violence and no Order of Protection.

Carroll also seeks an order directing the Defendants to perform the following

affirmative acts:

> 6. Immediately return to plaintiff all firearms seized from him and retained by defendants;
> 7. Within 60 days institute a procedure, in the event of any confiscation of firearms, setting forth a deadline for the return of the

firearms and pistol license to their owner, within fourteen days and if not returned by said deadline, a procedure for a hearing before a judicial officer, not more than fourteen days after said confiscation, as to the lawful reasons for retaining said firearms, with defendant having the burden of proof thereof.

According to Carroll, he completed the Long Gun Review Record form and mailed it to Inspector Gisondi on June 2, 2015. The Court notes that a copy of this form, which is dated May 29, 2015, is in the record.

On September 4, 2015, the Defendants opposed the instant motion, contending in a legal memorandum that:

Since the time plaintiff filed his motion on May 15, 2015, Defendants have provided Plaintiff's counsel with documentation which requires the signature of Plaintiff's mother and anyone else residing with Plaintiff before his long guns can be returned. In addition, Plaintiff is required to provide a letter detailing the incident that lead [sic] to the confiscation of his long guns together with the reasons that why [sic] his long guns should be returned to him as well as his plan to fully secure the guns before they can be returned to him. To date, none of the required documentation has been provided to the police department.

The Court notes that these statements were made by counsel in a hybrid letter/brief to the Court. The Defendants fail to attach any documentary proof that the requests referenced by counsel were made, or when, and they fail to submit the sworn statements of anyone associated with the Department to support the truth of these assertions. Of note, they also fail to point to any provision of the Confiscation Policy that requires Carroll to supply information such as (a) documentation signed by his mother and others residing in his home, (b) a letter detailing the incident that led to the confiscation of his firearms, (c) a statement of reasons why his

firearms should be returned to him, and (d) his plan to fully secure the firearms, as a precondition to the Department returning his property to him.

The evidence in the record appears to dispute the Defendants' factual assertions. In this regard, a sworn declaration by the Plaintiff's attorney indicates that, after receiving the Long Gun Review Record form from Inspector Gisondi on May 14, 2015, "no other forms were received by [his] office to be completed by Carroll or others." In addition, in a reply affidavit, Carroll stated that, after returning the completed Long Gun Review Record form, he "received no other forms or request[s] for information from the police department." Also, as noted above, the plain language of the Policy, upon which both parties affirmatively rely, apparently does not require the owner of confiscated property to provide any documentation other than the Long Gun Review Record in order to facilitate a final determination by the Department.

According to Carroll, at least as recently as September 9, 2015, he had not received any additional information or instructions from the Department regarding the return of his firearms. On that date, in response to the position taken by the Defendants in their opposition to the instant motion, both Carroll and his attorney sent additional letters to Inspector Gisondi. Carroll's letter stated, in pertinent part, as follows:

> The [subject] firearms were secured by action locks and in my locked apartment. I have since obtained a steel gun safe in which to store my firearms. . . .
> My guns should be returned to me because they are my property, they were legally purchased and possessed and I have never

threatened or harmed anyone with a gun or otherwise. I am not
disqualified from possessing firearms under Federal or State law.

Also attached hereto is a copy of the Long Gun Review Form which
I understand the County Attorney claims was never sent. I sent it on
June 2, 2015. I never received any mail directly from you regarding
this matter. If there is anything else you need please let me know.

The letter sent by Carroll's attorney, Robert T. Bean, Esq., states, in relevant

part, as follows:

. . . I received the enclosed letter from you on May 29, 2015. The
completed [Long Gun Review Record] form was returned to you by Mr.
Carroll on June 2, 2015. I have received no other request for
information from you regarding this matter. If you require additional
information, please let me know. If you have an e-mail address, that
would speed communications.
   Please call me to schedule [a post-deprivation] hearing. I am
available September 14-17 and then after September 30, 2015. Thank
you for your help in this matter.

Despite having apparently taken the position in this action that Carroll's

firearms could not be returned, partly, because additional information was required,

there is no evidence that the Defendants responded in any way to either of the

letters from the Plaintiff and his counsel.

## II.    Discussion

## A.    The Applicable Legal Standards

" 'A preliminary injunction is an extraordinary remedy never awarded as of

right.' " Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 192 (E.D.N.Y.

2013) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24,

129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). Whether or not to grant a preliminary

injunction is left to the discretion of the district court. See Sagepoint Fin., Inc. v.

Small, 15-cv-571, 2015 U.S. Dist. LEXIS 64065, at *6 (E.D.N.Y. May 15, 2015) (quoting Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 511 (2d Cir. 2005)).

"A party seeking a preliminary injunction must show: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Sagepoint, 2015 U.S. Dist. LEXIS 64065, at *6 (quoting Zino Davidoff SA v. CVS Corp., 571 F.3d 238, 242 (2d Cir. 2009)); see Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc., 696 F.3d 206, 215 (2d Cir. 2012) (reciting applicable standard); Crichlow v. Fischer, 12-cv-7774, 2015 U.S. Dist. LEXIS 18812, at *15-*16 (S.D.N.Y. Feb. 17, 2015) (reciting standard, quoting Mullins v. City of New York, 626 F.3d 47, 52-53 (2d Cir. 2010)).

"[W]here, as here, a party seeks a preliminary injunction that is 'mandatory,' *i.e.*, 'alter[s] the *status quo* by commanding some positive act,' a heightened showing is necessary." Vringo, Inc. v. ZTE Corp., 14-cv-4988, 2015 U.S. Dist. LEXIS 71919, at *12 (S.D.N.Y. June 3, 2015) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995)). In this regard, such an injunction "'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" Id. at *12-*13 (quoting Doherty Assocs., 60 F.3d at 34). "'This higher standard is particularly appropriate when a plaintiff seeks a preliminary injunction

against a government body'" such as a municipality and its police department. <u>N.J. v. New York</u>, 872 F. Supp. 2d 204, 211-12 (E.D.N.Y. 2011) (Spatt, J.) (quoting <u>Cave v. East Meadow Union Free Sch. Dist.</u>, 480 F. Supp. 2d 610, 631-32 (E.D.N.Y. 2007)).

As to the Plaintiff's burden of establishing irreparable injury in the absence of an injunction, "[s]uch injury must be 'neither remote nor speculative, but actual and imminent and . . . cannot be remedied by an award of monetary damages.'" <u>Vringo, Inc. v. ZTE Corp.</u>, 14-cv-4988, 2015 U.S. Dist. LEXIS 71919, at *27-*28 (S.D.N.Y. June 3, 2015) (quoting <u>Shapiro v. Cadman Towers, Inc.</u>, 51 F.3d 328, 332 (2d Cir. 1995)). Indeed, a bare assertion of a constitutional injury, without evidence "convincingly show[ing]" the existence of noncompensable damages, is insufficient to automatically trigger a finding of irreparable harm. <u>KM Enters. v. McDonald</u>, 11-cv-5098, 2012 U.S. Dist. LEXIS 20469, at *10-*11 (E.D.N.Y. Feb. 16, 2012) (Spatt, J.) (citing <u>Savage v. Gorski</u>, 850 F.2d 64, 68 (2d Cir. 1988)), <u>aff'd</u>, 518 F. App'x 12 (2d Cir. 2013); <u>see</u> <u>Donohue v. Mangano</u>, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012) (Spatt, J.).

"'The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction.'" <u>7-Eleven, Inc. v. Khan</u>, 977 F. Supp. 2d 214, 234 (E.D.N.Y. 2013) (Spatt, J.) (quoting <u>Kamerling v. Massanari</u>, 295 F.3d 206, 214 (2d Cir. 2002)).

In this regard, "[t]he court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm . . . Instead, the court must

actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are adequate to compensate for that injury.'" Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)).

**B.      As to the Request for a Preliminary Injunction**

As noted above, this case is one in a series of close to identical cases. The plaintiffs in these cases, including Carroll and Marc W. Weinstein, are represented by the same counsel; they submitted similar factual affidavits in support of one another's positions; and they filed motions that are near-verbatim reproductions of one another. Accordingly, this Court's opinion in Weinstein v. Krumpter, 14-cv-7210, 2015 U.S. Dist. LEXIS 108169 (E.D.N.Y. Aug. 17, 2015) (Spatt, J.), which was decided on the same facts and evidence as are present in this motion, is of importance with regard to the outcome here.

However, the Court notes a material distinguishing characteristic of Carroll's case, which was not present in the related Weinstein case – namely, Weinstein's firearms had been returned to him by the time his motion for a preliminary injunction was adjudicated. To date, Carroll's firearms remain in police custody. Indeed, a greater sense of exigency is attached to Carroll's application because the receipt that he received when his firearms were confiscated warned that "[l]egal disposition of all licensed firearms, rifles, shotguns and other weapons must be

made within one year from the date of this receipt, or same will be destroyed in accordance with law." The confiscation occurred on September 30, 2014, more than one year ago, and therefore, Carroll properly has concern that the Department will destroy his property.

However, as in <u>Weinstein</u>, in this case, the Court is unable to conclude that preliminary injunctive relief is necessary to prevent an actual and imminent injury that cannot be compensated by an award of money damages. Even if, as Carroll fears, the Department destroys his property without constitutional Due Process, his action will proceed and, if he prevails, he will be entitled to money damages commensurate with his loss. As was true in the <u>Weinstein</u> case, perhaps recognizing this reality, Carroll's complaint specifically seeks an award of monetary damages, including punitive damages, for the past deprivation of his rights. In addition, he has already purchased a new rifle while his other firearms were in police custody. Thus, in the Court's view, there is no risk of an imminent noncompensable injury to Carroll if he does not succeed on the instant motion, but ultimately prevails on the merits of his claims.

As the Court has also previously noted, although a presumption of irreparable harm generally attaches to alleged deprivations of constitutional rights, <u>see</u> <u>Donohue</u>, 886 F. Supp. 2d at 150, the record does not support a finding that any such rights will be impaired during the pendency of this case. In this regard, as Weinstein previously sought, Carroll seeks to enjoin the Defendants from searching for and seizing firearms in his home and the homes of similarly situated

individuals – a theoretical Fourth Amendment violation. However, as in Weinstein, he points to no evidence beyond his prior experience and the existence of the NCPD Confiscation Policy to show that such a violation is likely to occur.

Similarly, there is no showing of an actual and imminent Second Amendment violation because there is no evidence that the Defendants are presently preventing Carroll from bearing arms in a manner consistent with the United States Constitution. Although it is true that he was dispossessed of certain firearms, he concedes that he was immediately able to purchase new ones. In the recent case of Panzella v. County of Nassau, upon which Carroll relies, the district court noted that " 'the right to bear arms is not a right to hold some particular gun.' " 13-cv-5640, 2015 U.S. Dist. LEXIS 133475, at *30 (E.D.N.Y. Aug. 26, 2015) (quoting Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 429 (S.D.N.Y. 2013)).

Further, as in Weinstein, on the record before it, the Court is unable to conclude that the Department's Confiscation Policy is being regularly applied in an unconstitutional manner, so as to require immediate cessation. As the Court previously noted, the facts set forth in the supporting affidavits of Carroll, Weinstein, and Livore involve domestic disputes which became sufficiently serious so that the police were called to intervene. In this regard, the Court reiterates that Carroll, himself, called the police to report that his mother had stolen a semi-automatic rifle from his apartment and "sold it or g[ave] it to another person."

Carroll may ultimately succeed in establishing that the Defendants violated his constitutional rights, and their own Confiscation Policy, by failing to return his

property in a manner consistent with federally-recognized principles of Due Process. However, the current record does not support a finding that the initial confiscation was unconstitutional; that the Department's response to Carroll's 911 call constituted an unsolicited intrusion into his privacy, in violation of the Fourth Amendment; or that Carroll – or Weinstein and Livore, for that matter – are at imminent risk of similar police activities, or any constitutional violation, if a preliminary injunction does not issue.

Accordingly, the Court denies those portions of the Plaintiff's motion which seek, during the pendency of this action: to prevent the Defendants from destroying his confiscated firearms; from retaining possession of said firearms; from searching for and temporarily seizing firearms in his home and the homes of similarly situated individuals; and to require the Defendants to immediately return all firearms seized from him.

Further, in light of the fact that Carroll's motion is, in all other respects, indistinguishable from the motion that was at issue in the <u>Weinstein</u> case, the Court now adopts its reasoning from that opinion to deny Carroll's remaining requests for relief.

In particular, the Court denies the motion to the extent it seeks to prevent the Defendants from continuing to enforce the Confiscation Policy. In this regard, Carroll fails to identify which of his particular constitutional rights will be actually and imminently affected if his request is not immediately granted. As the Court held in <u>Weinstein</u>, the present record is insufficiently developed to support the

conclusion that Carroll's experience, even as amplified by the experiences of Weinstein and Livore, justifies discontinuing a policy rationally intended to bolster public safety. Despite bearing the increased burden of proof on this motion, Carroll does not address the public policy considerations underlying the Confiscation Policy, nor does he present any evidence that, as a general matter, the policy fails to accomplish its goal of enhancing public safety. As the Court previously noted:

> [The Plaintiff] has not met his burden of justifying the need to suspend police activity aimed at removing guns from potentially serious domestic situations that result in police intervention. Indeed, it may be true that the present policy occasionally would deprive nonviolent and law-abiding individuals of their firearms during the pendency of a police investigation. Also, apparently, some of these investigations take longer than certain gun owners would like. However, at this juncture, without evidence that the police were or are likely to actually and imminently act in a way that violates [the Plaintiff]'s constitutional rights, the individualized accounts presented here do not support a finding that the policy is unconstitutional as applied, requiring its immediate discontinuance.

Weinstein, 2015 U.S. Dist. LEXIS 108169, at *22.

In the Court's view, there being no basis for enjoining the continued enforcement of the Confiscation Policy, there also is no basis for replacing that policy with the one proposed by Carroll. The Court notes that a substantially similar version of Carroll's proposed policy was already considered and rejected by this Court in Weinstein.

In this regard, Carroll has not satisfied the heightened burden imposed upon parties seeking a mandatory injunction requiring performance of some affirmative action, namely, a "clear showing" that he is entitled to have his proposed procedure implemented by the County or the Department. As was the case in Weinstein,

Carroll has presented no evidence whatsoever of the proposed procedure's feasibility or effectiveness; nor does he allege that the proposed policy is derived from meaningful research or planning; nor does he purport to have any knowledge of the legal, administrative, or logistical implications of forcing the County or the Department to implement such a procedure. Of importance, similar to the Plaintiff in <u>Weinstein</u>, he does not claim that, in the absence of this particular procedure, his constitutional rights will be actually and imminently impaired.

The Court notes that, if Carroll prevails in this case, and proves that the Confiscation Policy, as it relates to the return of confiscated weapons, is inconsistent with established constitutional safeguards, modifications to the policy will likely be in order. However, at this early stage of the litigation, the Court can discern no basis for concluding that Carroll is entitled to immediate implementation of his desired plan.

Accordingly, the Court finds that the Plaintiff has not met his burden of demonstrating an essential element of a preliminary injunction, namely, the likelihood of irreparable harm in the absence of such an injunction, and his motion is denied in its entirety. At this time, the Court need not reach the element of whether Carroll is likely to succeed on the merits of his claims.

### III.    Conclusion

Accordingly, based on the foregoing, the Court denies the Plaintiff's motion for a preliminary injunction.

**SO ORDERED**

Dated:          Central Islip, New York
                November 30, 2015          */s/ Arthur D. Spatt*
                                            ARTHUR D. SPATT
                                            United States District Judge