**FILED**
**CLERK**

11:45 am, Jul 12, 2019

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
ANDREW CARROLL,

                    Plaintiff,

          -against-

THOMAS C. KRUMPTER, Acting Police
Commissioner, Nassau County, New York,
STEVEN E. SKRYNECKI, Chief of Department,
Nassau County Police Department, DANIEL P.
FLANAGAN, Commanding Officer, First
Precinct, Nassau County Police Department,
OFFICER BUDLINIC, Police Officer, First
Precinct, Nassau County Police Department,
OFFICER JOHN DOE, Police Officer, First
Precinct, Nassau County Police Department,
PAUL CAPPY, and COUNTY OF NASSAU,

                  Defendants.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
2:15-cv-1550 (ADS)(ARL)

**<u>APPEARANCES:</u>**

**The Law Office of Robert T. Bean**
*Counsel for the Plaintiff*
3033 Brighton Third Street
Brooklyn, NY 11235
        By:   Robert T. Bean, Esq., Of Counsel

**Nassau County Attorney**
*Counsel for the Defendants*
One West Street
Mineola, NY 11501
        By:   Ralph J. Reissman, Esq., Deputy County Attorney
             Diane C. Petillo, Esq., Deputy County Attorney

1

**SPATT, District Judge.**

In this case, Andrew Carroll ("Carroll" or the "Plaintiff") challenges the constitutionality of the Nassau County Police Department's (the "Department" or "NCPD") policy of confiscating firearms in the course of responding to domestic incidents. On March 25, 2015, the Plaintiff commenced this action against the Department, Acting NCPD Commissioner Thomas Krumpter ("Krumpter"), NCPD Chief Steven E. Skrynecki ("Skrynecki"), NCPD First Precinct Commanding Officer Daniel P. Flanagan ("Flanagan"), NCPD Officer Budlinic ("Budlinic"), and the County of Nassau (the "County") (together, the "Defendants"). Carroll originally asserted deprivations of his Second, Fourth, Fifth and Fourteenth Amendment rights as well as various state law causes of action. Since then, the Plaintiff has withdrawn his Second Amendment claim. *See* Docket Entry ("Dkt.") 45 at 1.

On May 15, 2015, the Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P." or "Rule") 65 seeking a preliminary injunction. This Court denied the Plaintiff's motion seeking a preliminary injunction on November 30, 2015, because Carroll failed to identify any actual and imminent harm that he would suffer if an injunction did not issue. On February 13, 2018, the Plaintiff filed one of the instant motions, pursuant to Fed. R. Civ. P. 56, seeking summary judgment in his favor. The other instant motion, filed on November 14, 2018 by the Defendants, seeks summary judgment pursuant to Fed. R. Civ. P. 56 in their favor.

On December 4, 2018, the instant motions were fully briefed.

Four days ago, the Court decided a summary judgment motion in a similar case, *Weinstein v. Krumpter*, —F. Supp. 3d—, 2019 WL 2921794 (E.D.N.Y. July 8, 2019) (Spatt, J.), which also challenged the constitutionality of the same NCPD policy at issue in this case. There, this Court ruled that OPS 10023 as applied to longarms violated the Fourteenth Amendment's right to

procedural due process and found a triable issue of fact as to whether the warrantless seizure of Weinstein's firearms complied with the Fourth Amendment. While the facts are not identical in the instant case, much of this Court's analysis in *Weinstein* applies with equal force to the instant facts. As such, the Court used many parts of the *Weinstein* decision to decide the motions in this case.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed and are drawn from the parties' Local Rule 56.1 statements.

### A. THE FACTUAL BACKGROUND

#### 1. The Incident

On September 30, 2014, Carroll resided at 7 Belt Street, North Bellmore, New York (the "Residence"). The Plaintiff's mother, Margaret Carroll ("Margaret") and grandmother, Evelyn Carroll ("Evelyn"), also resided at the home. Evelyn, who suffers from dementia, is the owner of the Residence. She lives on the ground floor of the Residence; Margaret lives in the basement and the Plaintiff lives on the second floor of the Residence. Margaret was previously diagnosed with schizophrenia. At the time of the incident, the Plaintiff owned three firearms: (1) a Mossberg 12-gauge shotgun; (2) a 22 caliber rifle manufactured by the Henry Repeating Arms Company; and (3) an AR-15 rifle manufactured by Dark Storm Industries. He also possessed a 5.56 millimeter ammunition magazine. All three firearms were kept under Carroll's bed at the Residence.

At some point that day, Margaret contacted the Plaintiff while he was at work to request that Carroll repay money previously lent to him by Margaret. The Plaintiff disputes the contention that he owed Margaret any money at that time. Later in the day, Carroll arrived at the Residence and discovered that his AR-15 rifle was missing from his bedroom. He confronted Margaret, who

told him "I gave it to somebody. You owed me the money and I owed him. So, I gave it to him as collateral."

At approximately 6:03 p.m., the Plaintiff called 911 to report the stolen firearm. NCPD Sergeant Arnold Rothenberg ("Rothenberg"), a Patrol Supervisor at the First Precinct, was dispatched to the Residence. When Rothenberg arrived at the Residence, he was met by Budlinic as well as fellow Police Officers Brett Roslow and Ralph Swanson who had already arrived on scene. Budlinic informed Rothenberg that Margaret had let him know that she was involved in a lengthy dispute with Carroll over his purchase of one of the rifles. Margaret claimed that she lent Carroll money for an undisclosed purpose and that against her wishes, he used the money to purchase a firearm. This argument allegedly culminated in September 2014 when Margaret took possession of the firearm from Carroll's bedroom. Although the Plaintiff disputes that such a disagreement existed, the two were engaged in an argument at the time of the incident. The details of Carroll's quarrel with Margaret is largely irrelevant to the disposition of the instant motion.

When Budlinic requested that Margaret turn over the firearm, she promptly retrieved it from her living area and handed Budlinic a fully loaded rifle. After consulting with the officers on scene, Rothenberg decided to remove all three firearms from the Residence. "This decision was based on the fact [that] the mother and son had argued over a loaded rifle. That an unsecured weapon was in the hands of a woman who admitted to officers she suffered from schizophrenia was another factor I considered. The mother's claim her son had mental issues also weighed heavily in my decision. … Although there was no indication the son had threatened the mother, it was my opinion that leaving unsecured firearms in this residence could lead to catastrophic violence." Dkt. 43, Ex. D at 1. Budlinic filled out a New York State Domestic Incident Report, which the Plaintiff signed.

Rothenberg reports that the Plaintiff voluntarily surrendered the firearms. Carroll disputes this fact. The NCPD did not obtain a search warrant at any time during its investigation of the incident.

## 2. Applicable Laws & Regulations

A "firearm" includes (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length. N.Y. Penal Law § 265.00(3). A rifle is a "weapon designated or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger." N.Y. Penal Law § 265.00(11). A shotgun is a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger." N.Y. Penal Law § 265.00(12). Rifles and shotguns are commonly referred to as longarms. The policy at issue is Police Department Procedure OPS 10023, entitled "Removal and Dispositions of Weapons – Domestic Incidents / Threats to Public Safety ("OPS 10023" or the "Policy"). The Policy establishes a framework for removing firearms, rifles, and shotguns and details the following procedure:

1. *Confiscates* illegally possessed firearms, rifles, and shotguns *and*

a. if present, *arrests* the offender, ...

b. *processes* the evidence.

2. *Confiscates* pistol licenses and licensed firearms when the licensee is:

a. arrested,

b. the subject of an order of protection,

c. involved in physical violence or the threat of violence.

\* \* \*

3. *Confiscates* legally possessed firearms, rifles and shotguns when such firearms, rifles and shotguns create a threat of violence or threat to the public safety.

4. *Accepts* legally possessed firearms, rifles, and shotguns that are voluntarily surrendered by persons.

5. *Renders* firearms, rifles, and shotguns safe.

6. *Prepares* PDCN Form 41, Property Receipt, *and*

a. gives a copy to the owner,

b. *forwards* a copy to the Precinct Domestic Incident Liaison Officer,

7. *Invoices* the confiscated property.

Dkt. 43, Ex. H (emphasis in original). OPS 10023 also explains the framework that governs "returning, retaining or destroying the firearms, rifles, and shotguns after completion of an investigative review." The Precinct Domestic Incident Liaison Officer must do the following:

1. *Reviews* all incidents involving confiscation of rifles and shotguns as soon as possible,

2. *Determines* if the confiscation of rifles and shotguns was appropriate.

3. *Ensures* the immediate return of confiscated rifles and shotguns in the following situations:

a. confiscation was inappropriate,

b. new information is learned which makes the confiscation inappropriate.

4. *Initiates* an administrative review to determine if a legal impediment exists not to return confiscated rifles and shotguns,

5. *Mails* the following forms, return receipt requested, to the owner of the rifles and shotguns:

a. PDCN Form 173, Long Gun Review Record, and

b. Long Gun Cover Letter.

6. *Forwards mandatory* information to the Desk Personnel and *directs* them to request a National Crime Information Computer (NCIC) inquiry, using the QICS format, to determine if there is any information that would prohibit a return of firearms, rifles, and shotguns under the Federal Gun Control Act [18 U.S.C. § 922] ...

* * *

12. *Determines* if any of the following conditions exist:

a. the owner is prohibited from possessing rifles or shotguns under the Federal Gun Control Act,

b. the owner has a relevant pending court disposition,

c. the owner is a subject of an order of protection,

d. the owner has a relevant Nassau County arrest history,

e. domestic incidents have occurred since the time of the confiscation or voluntary surrender,

f. other extenuating circumstances which indicate that rifles and shotguns should not be returned.

13. *Interviews* the investigating detective, if the Detective Division was involved in the initial incident.

14. *Interviews* the victim of a domestic incident, outside the presence of the offender, to determine the following:

a. current status of the relationship,

b. if there have been any threats since the initial incident,

c. whether the victim believes that the rifles and shotguns can be safely returned,

d. any other circumstances relevant to the return of the rifles and shotguns.

15. *Reviews* the gathered information to determine if the rifles and shotguns should continue to be held or be returned.

16. If notified by a Pistol License Section Supervisor that the owners [sic] license has been reinstated:

a. *prepares* a brief narrative report outlining the investigation, indicating that Pistol License Section has concluded a pistol license investigation and is reinstating the owner['] s license, and

b. *forwards* the following to the Patrol Division Domestic Incident Coordinator:

(1) narrative report,

(2) copy of internal correspondence received from Pistol License Section regarding the reinstatement of pistol license. ...

17. *Prepares* a brief narrative report outlining the investigation, including a recommendation as to whether the rifles and shotguns should be returned.

18. *Prepares* the following forms, if the rifles and shotguns will be returned:

a. PDCN Form 83, and

b. PDCN Form 110, Property Bureau Notice to Claimant Card.

19. *Forwards* the following to the Patrol Division Domestic Incident Coordinator:

a. narrative report,

b. PDCN Form 83, if prepared,

c. PDCN Form 100, if prepared.

* * *

23. If the shotguns and rifles *will not* be returned, *notifies* Legal Bureau to initiate legal proceedings.

24. *Notifies* the following regarding the status of the rifles and shotguns:

a. victim, if one exists,

b. owner, only if rifles and shotguns will be returned.

25. *Notifies* PB to destroy firearms, rifles and shotguns in the following situations:

a. owner [cannot] be located,

b. owner does not want rifles and shotguns returned,

c. an investigation reveals a legal impediment still exists not to return the rifles and shotguns.

*Id.* (emphasis in original).

No license is required to possess longarms in Nassau County.

**3. Firearm Retrieval Process**

When longarms are confiscated, the Deputy Commanding Officer is designated as the Precinct Domestic Incident Liaison Officer and initiates an investigation into whether longarms should be returned.   As noted above, Carrol's firearms were confiscated on September 30, 2014. The Plaintiff's longarms were transported to the First Precinct, where they were vouchered and kept until being transferred to the NCPD Property Bureau.

On May 14, 2015, NCPD Deputy Inspector John Gisondi ("Gisondi"), the Domestic Incident Liaison Officer for the First Preceinct mailed a letter to the Plaintiff's attorney, who he had retained in this matter, which stated: "Be advised that this Department is in possession of long gun(s) belonging to your client, Andrew Carroll.  Please have your client complete the enclosed Long Gun Review Record form and return it to [the NCPD]. … Your response will be reviewed and considered in deciding the eventual disposition of any long gun(s)."  Dkt. 43, Ex. I.  At an undisclosed point after that, the Plaintiff returned the Long Gun Review Record form.

On June 19, 2015, Gisondi sent the Plaintiff a letter that informed Carroll that form letters needed to be filled out and notarized by Margaret as well as any other persons who lived in the Residence at the time of the incident, including Evelyn.  The letter also instructed Carroll to write a letter that detailed the incident and explained both the reason he would like them to be returned and how he plans to safeguard them upon retrieval.  The form letters, which needed to be signed by Evelyn and Margaret, stated that the signing party had no objection to the return of the firearms, did not feel threatened by Carroll, and did not believe that she would be endangered if the firearms

were returned.  The NCPD never received completed and notarized form letters from Margaret or Evelyn and NCPD policy precluded Carroll's investigation from continuing.

On July 17, 2015, Gisondi mailed a letter to the Plaintiff's attorney informing him that in the future, all correspondences shall be mailed to the attorney rather than Carroll.  The Plaintiff's attorney responded on September 9, 2015 by including information regarding the firearm safety measures that Plaintiff was prepared to undertake, and the Plaintiff's version of events.

As stated *supra*, the Court denied the Plaintiff's motion for a preliminary injunction on November 30, 2015.  For approximately two and a half years, the investigation remained stalled due to the lack of receipt of signed and notarized form letters from Margaret or Evelyn.  At some point, Evelyn returned a signed letter to the NCPD that stated that she did not object to the return of Carroll's firearms.  On February 16, 2018, Deputy Commanding Officer John Conti concluded his investigation, finding that Margaret no longer resided at the Residence and recommending the return of two of the three firearms, specifically the .22 caliber rifle and the 12-gauge shotgun.  He further held that the AR-15 qualified as an assault rifle under New York State law and could only be transferred to Carroll by a federally licensed firearm dealer.  The NCPD informed the Plaintiff that it would retain the weapon until arrangements could be made.  The record does not reflect whether the AR-15 remains in the custody of the NCPD.  On April 5, 2018, Carroll retrieved the other two firearms from the NCPD.

## II.  DISCUSSION

### A.  STANDARD OF REVIEW: FED. R. CIV. P. 56

Pursuant to Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Kwong v.*

*Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In considering a summary judgment motion pursuant to Rule 56, the Court must "view the evidence in the light most favorable to the non-moving party … and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted); *see also Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007) (noting that in deciding a summary judgment motion, the court will "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all inferences and resolv[e] all ambiguities in favor of the nonmoving party"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (stating that in deciding a Rule 56 motion, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." (internal citations omitted)).

It is the movant's burden to initially demonstrate the absence of material facts that preclude summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005) (citing *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)). Such a "burden on the moving party may be discharged by 'showing' … that there is an absence of evidence to support the nonmoving party's

case." *PepsiCo, Inc. v. CocaCola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). If the moving party meets the initial burden, the nonmoving party must present specific facts that demonstrate there is a genuine issue that should be left for the fact-finder to decide. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); *see also Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (requiring the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts … the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" (internal citations omitted)).

It is not the Court's responsibility to resolve any purported issues of disputed facts, but merely to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (internal citations omitted); *accord Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012) (stating that the Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried"); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (noting that the responsibility of the district court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" (quoting *Anderson*, 477 U.S. at 249)). If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not present. *Anderson*, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. Conjecture, speculation, or conclusory statements are not enough to defeat summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citations omitted).

## B. FOURTH AMENDMENT CLAIM

The Defendants move for summary judgement on Carroll's Section 1983 cause of action for the purported violation of his Fourth Amendment rights. He argues that the NCPD's search of the upstairs of the Residence and the seizure of his firearms violated his Fourth Amendment right to be free from unreasonable searches and seizures.

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. "The warrant requirement of the Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (internal citations omitted); *see also United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) ("A warrantless search is *per se* unreasonable … subject only to a few specifically established and well-delineated exceptions." (internal citations and quotation marks omitted)). Accordingly, "[t]he Fourth Amendment generally prohibits a warrantless entry into an individual's home." *Callahan v. City of New York*, 90 F. Supp. 3d 60, 69 (E.D.N.Y. 2015).

The Plaintiff does not contend that the NCPD's original entry into the residence was unjustified. *See Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had a substantial reason to believe that one of the parties to the dispute was in danger."). Rather, he asserts that the

NCPD improperly entered the upstairs portion of the Residence after the initial entry and seized his firearms without a warrant.

In the present case, there is insufficient information in the record to determine whether the seizure of the Plaintiff's longarms deprived him of his Fourth Amendment right to be free from unreasonable searches or seizures. At this current stage of the litigation, there is inadequate material in the record to determine whether the warrantless search of the upstairs of the residence was justified by either exigent circumstances or consent.

The Defendants contend that the NCPD was authorized to seize the Plaintiff's longarms based on exigent circumstances. *See Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 236 (E.D.N.Y. 2010) ("A warrantless search is permissible if exigent circumstances require state officials' immediate entry to the property."). To decide whether exigent circumstances existed, "[t]he essential question … is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) (quoting *MacDonald*, 916 F.2d at 769); *see also United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) (same); *Rogers v. Apicella*, 606 F. Supp. 2d 272, 286 (D. Conn. 2009) (same). The responding police officers needed "probable cause plus exigent circumstances in order to make a lawful entry" into the residence or seize the Plaintiff's property. *Harris v. O'Hare*, 770 F.3d 224, 231-32 (2d Cir. 2014) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002)).

"The test for determining exigent circumstances is an objective one that turns on the totality of the circumstances confronting law enforcement agents in a particular case." *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 139 (D. Conn. 2004). In this circuit, there are six factors that are considered when determining the existence of exigent circumstances:

> (1) the gravity or violent nature of the offense the suspect allegedly committed; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause that the suspect committed the crime; (4) strong reason to believe the suspect is in the premises being entered; (5) a likelihood the suspect will escape if not swiftly captured; and (6) the peaceful circumstances of the entry.

*Id*. (citing *MacDonald*, 916 F.2d at 769-70). A court may also examine if law enforcement had "a reasonable belief … that the targets of an investigation are armed or that quick actions is necessary to prevent the destruction of evidence." *Id*. These factors are "merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *United States v. Medina*, 944 F.2d 60, 68 (2d Cir. 1991). They are meant "as guideposts intended to facilitate the district court's determination." *MacDonald*, 916 F.2d at 769. Even the presence of a single factor may be sufficient to find the existence of exigent circumstances. *Id*. at 770.

Carroll's 911 call reported a stolen firearm. When officers arrived, they interviewed the parties and learned of the Plaintiff's dispute with Margaret over the rifle. At some point in the evening, the officers learned that Margaret had retrieved the weapon from Carroll's upstairs bedroom and stored it in her downstairs room. Budlinic requested that Margaret turn over the firearm, which she did. Although the rifle was fully loaded, there is no indication that Margaret ever presented a threat to herself, Carroll, or the officers. Rather, the officers allowed Margaret to retrieve the weapon from the basement and hand it to them. These actions do not indicate that the officers on scene viewed Margaret or Carroll as a danger. Neither Margaret nor Carroll were armed during the dispute nor did either ever threaten the use of firearms. The record does not reflect a particularly chaotic or dangerous scene. By the time the officers determined that the remainder of the firearms would be confiscated, Margaret had already availed herself of the weapon in her living area.

The Court cannot conclude that exigent circumstances existed at the time the confiscation occurred. At the time the officers confiscated the firearms, it cannot be said that the officers had an "'urgent need' to render aid or take action" as a matter of law. *Loria*, 306 F.3d at 1284.

Further, the Defendants cite Rothenberg's August 21, 2015 statement to argue that the Plaintiff consented to the search of his upstairs living area. *See* Dkt. 43, Ex. D. Carroll disputes that he ever voluntarily surrendered his firearms; instead, he asserts that the officers "pushed right past [him]" and retrieved them without asking for permission. Dkt. 38-10 at 75:17-76:2. This creates a disputed issue of fact as to whether Carroll ever gave consent to seize his remaining firearms.

It is also unclear whether Carroll was the sole individual who could have consented to a search or seizure of the upstairs bedroom. The record does not establish whether Carroll rented the upstairs living area from Evelyn, who had physical access to the bedroom, whether it had a separate lock from the remainder of the Residence, who had use of the room, and whether there was a lease or contract governing these issues. The answer to these questions would help determine who was able to provide consent for a search. *See United States v. Perez*, 948 F. Supp. 1191, 1201 (S.D.N.Y. 1996) ("This Circuit has repeatedly upheld, under the proper circumstances, searches of adult defendants' bedrooms and other private spaces within a home where another occupant of the home consented to the search."); *United States v. Venizelos*, 495 F. Supp. 1277, 1283-85 (S.D.N.Y. 1980). Without knowing more about the Residence as well as the relationship between those living in it, this Court cannot conclude that consent was given to seize the Plaintiff's firearms from his upstairs bedroom.

The above-mentioned disputed issues of fact preclude summary judgment as to the seizure of the Plaintiff's longarms.

Accordingly, the Plaintiff may proceed on his Fourth Amendment claim as it pertains to the seizure of Carroll's longarms.

**D. DUE PROCESS CLAIMS**

Both parties move for summary judgment regarding the Plaintiff's procedural due process claim pursuant to the Fifth and Fourteenth Amendments. Unlike the Fourth Amendment claim, this cause of action only addresses the process afforded to the Plaintiff after his firearms were confiscated; it does not address the legality of the search and seizure.

The Fifth Amendment instructs that "No person shall … be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. As with the remainder of the Bill of Rights, the Fifth Amendment is applicable to the states through the Fourteenth Amendment, which explicitly prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

As in *Weinstein*, the Plaintiff asserts that OPS 10023 did not afford him sufficient due process after the seizure of his firearms. 2019 WL 2921794, at *11. To advance this argument, Carroll relies on this Court's decision in *Razzano v. Cty. of Nassau*, 765 F. Supp. 2d 176 (E.D.N.Y. 2011) (Spatt, J.), which held that the previous NCPD policy regarding firearms provided inadequate post-deprivation process to the plaintiff. In *Razzano*, the Court described the applicable legal standards of the Fourteenth Amendment due process clause:

> In evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees. Where, as here, a

plaintiff alleges a deprivation pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing. Although the County points out that it apprised the Plaintiff of his post-deprivation remedies, in such instances, the availability of post-deprivation procedures will not, ipso facto, satisfy due process. Instead, courts must look to the three-part test articulated by the Supreme Court in *Mathews v. Eldridge*, to determine what level of process is due under the circumstances.

Under the *Mathews* test, courts weigh: (1) the private interest affected by the state action; (2) the risk of erroneous deprivation through the procedures used and the value of additional procedural safeguards; and (3) the government's interest in taking the challenged action.

765 F. Supp. 2d at 185 (internal citations, quotation marks, and alterations omitted).

The parties agree that the Plaintiff has a private interest in possessing longarms and that the confiscation of his longarms was pursuant to an established state procedure. Thus, this factor favors Carroll. To apply the second prong, the Court must consider "the risk of an erroneous deprivation of such interest through the procedures used, and the value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge*, 424 U.S. 334, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). As the Defendants describe, OPS 10023 contains the following procedural safeguards: (1) initiating of investigation by the Precinct Domestic Incident Liaison Coordinator; (2) require the owner to fill out Form 173; (3) initiation of an administrative review; (4) review the National Crime Information database to determine if there is anything that would permit a return of rifles under the Federal Gun Control Act; and (5) interviews with other parties or victims to obtain consent.

As in *Weinstein*, the Plaintiff contends that the above procedures failed to provide a meaningful opportunity to be heard in a timely and sufficient manner. To advance this argument, Carroll asserts that the current procedure for returning longarms, OPS 10023, does not meet the four requirements elucidated in *Razzano*. To review, *Razzano* required the County to initiate a prompt post-deprivation hearing that adhered to the following requirements:

18

First, the post-deprivation hearing must be held before a neutral decision-maker.

Second, … the right to a prompt post-deprivation hearing only applies to seized longarms that are not (1) the fruit of a crime, (2) an instrument of crime, (3) evidence of a crime, (4) contraband, or (5) barred by court order from being possessed by the person from whom they were confiscated.

Third, at the hearing, Nassau County shall have the burden of showing that it is likely to succeed in court on a cause of action—presumably forfeiture or a cause of action seeking an order of protection, although the Court does not limit Nassau County to these theories—to maintain possession of the seized longarms.

Fourth, if the person deprived of longarms prevails at the hearing, the longarms must be returned, barring an order to the contrary from a court to whom that finding is appealed. If, by contrast, Nassau County prevails at the hearing, Nassau County must timely commence a proceeding by which it seeks to maintain possession of the longarms in question.

*Razzano*, 765 F. Supp. 2d at 191. This remedy provides substantial protections to individuals whose longarms are seized at a relatively small cost to the County. The Defendants have not presented any evidence that a *Razzano* hearing would be overly costly or burdensome. As this Court explained both in *Razzano* and *Weinstein*, there is nothing preventing the County from having a single hearing officer review handgun licenses and longarms seizures.

The Defendants argue that the current procedure satisfies both *Matthews'* second prong and *Razzano* by providing a "specific process for an NCPD police officer to evaluate the level of danger involved in the domestic incident, with the paramount interest being NCPD's mission to protect and preserve public safety," Dkt. 43-2 at 14, and returning longarms after completion of the investigation, if warranted. The Court agrees, as a general matter, that OPS 10023 establishes a thorough procedure that ensures longarms are only returned to law abiding, responsible individuals. However, the effectiveness or scrupulousness of a procedure does not render it compliant with procedural due process. Notably, OPS 10023 does not provide a *prompt, post-deprivation hearing* to determine if longarms are being erroneously held by the NCPD. *See*

*Weinstein* 2019 WL 2921794, at *12. In executing its responsibility to protect the public, it remains possible that police officers may make a mistake in the course of the multitude of stressful, immediate decisions required while on duty. A prompt hearing would be valuable in correcting these mistakes and preventing erroneous deprivation.

While the scrupulousness of the procedure ensures the correct result, the lack of a prompt hearing leaves room for a heightened risk of prolonged deprivation for undeserving owners of longarms. *Id*. Notably, the current procedure does not provide swift relief. In the instant case, Carroll's firearms were seized on September 30, 2014. He was unable to retrieve his firearms until April 5, 2018, more than three and a half years after their seizure. This was substantially longer than the period at issue in *Weinstein*. 2019 WL 2921794, at *13. For many owners, including Carroll, the investigation is stalled for the failure of a victim to return his or her contact forms. For others, it is held up for failure to return a Long Gun Review Record form. This cannot indefinitely preclude individuals from receiving a timely decision in the investigative process. Owners of longarms are entitled to a *prompt* investigation to determine if their property has been erroneously seized from them. *Id*. Thoroughness of process is not sufficient to overcome the potential for erroneous deprivation; a timely process is required to satisfy constitutional muster. As the Second Circuit explained in *Panzella*, "a lengthy deprivation can be enough to violate the Fourteenth Amendment right to due process." *Panzella v. Sposato*, 863 F.3d 210, 218 n. 9 (2d Cir. 2017). For those who have had their longarms seized, three and a half years is much too long to wait for an adjudication of that process. The Court concludes that the current process raises a considerable risk of erroneous deprivation.

The third *Mathews* factor inquires as to "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural

requirement would entail." 424 U.S. at 335. The argument presented by the Defendants both here and in *Weinstein*, 2019 WL 2921794, at *13-14, in support of this factor mimics part of the argument advanced by the County in *Razzano*, that although the lack of license requirement allows individuals to replace confiscated longarms with newly purchased ones, the government has a critical interest in keeping guns away from dangerous individuals. As the Court previously explained in *Weinstein* and *Razzano*, a person's ability to purchase additional longarms to replace the weapons seized substantially limits the Defendants public safety interest in retaining confiscated longarms. *See Panzella*, 863 F.3d at 219 (holding that the plaintiff's ability to freely purchase additional longarms precludes the Court from relying on any public safety interest); 2019 WL 2921794, at *13 (finding that "a person's ability to purchase additional longarms to replace the weapons seized substantially limits the Defendants public safety interest in retaining confiscated longarms"); *Razzano*, 765 F. Supp. 2d at 189 ("[O]nce a person whose longarms are taken has the opportunity to legally obtain and possess new longarms, the retention of that individual's old longarms does not greatly protect the public from potential harm. It follows that the state's interest in retaining those longarms is similarly diminished.").

Having weighed the three *Mathews* factors, the Court finds that persons whose longarms are seized by the County are entitled to a prompt pre-deprivation hearing that is consistent with *Weinstein* and *Razzano*. *See Panzella*, 863 F.3d at 219 ("We therefore hold, consistent with the district court's decision in the instant case, and the decision in *Razzano*, that persons in [the plaintiff]'s situation are entitled to a prompt post-deprivation hearing under the four conditions set forth by the district court in this case and in *Razzano*.").

Accordingly, the Plaintiff's Fourteenth Amendment due process rights were violated. The Court respectfully refers this case to United States Magistrate Judge Arlene R. Lindsay for an inquest into any potential damages.

## E. MONELL CLAIMS

The Plaintiff argues that the individuals involved in the seizure of his longarms were acting pursuant to an official policy of the County and the NCPD in asserting a *Monell* claim against the County. To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)); *see also Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 611 (1978) ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels").

The Defendants assert that Carroll cannot state a *Monell* claim against the County because OPS 10023 does provide constitutionally sufficient procedural due process. As discussed *supra*, OPS 10023 violates the Fourteenth Amendment for failure to afford the requisite procedural due process protections. The Defendants' argument is now moot.

Accordingly, this Court denies the Defendants' cross-motion for summary judgment as it pertains to Carroll's *Monell* claim.

### III. CONCLUSION

For the reasons set forth above, the Plaintiff's motion for summary judgment is granted with respect to his Fourteenth Amendment procedural due process claim; the remainder of the motion is denied. Further, the Defendants' motion for summary judgment is denied.

The Court respectfully refers this case to United States Magistrate Judge Arlene R. Lindsay for an inquest into any potential damages stemming from the Plaintiff's Fourteenth Amendment Claim.

**SO ORDERED**

Dated: Central Islip, New York
July 12, 2019

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge
